IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

**PAMELA M. MINSON**,

                     Plaintiff,                            Civil No. 09-6224-SU

            v.                                **FINDINGS AND**
                                                        **RECOMMENDATION**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security

                     Defendant.

_____

SULLIVAN, Magistrate Judge:

       Plaintiff Pamela Minson ("Minson") seeks judicial review of the Social Security

Commissioner's final decision denying her application for Supplemental Security Income ("SSI")

under Title XVI of the Social Security Act ("Act").  This court has jurisdiction under 42 U.S.C. §

405(g) and 42 U.S.C. § 1383(c)(3).

1 - FINDINGS AND RECOMMENDATION

For the reasons below the Commissioner's decision should be REVERSED and REMANDED for the immediate calculation and award of benefits.

## **BACKGROUND**

Born on July 6, 1957 (Tr. 73[1]), Minson reports a ninth-grade education (Tr. 84) and illiteracy. Tr. 419.  Minson applied for SSI on September 10, 2004, alleging disability since birth (Tr. 73), due to dwarfism, mild mental retardation, and learning disabilities.  Tr. 801, 116, 124.  Minson reports work as a part-time motel housekeeper between 2001 and 2002.  Tr. 81.

Minson previously applied for disability benefits on January 19, 1993, based upon her dwarfism alone.  Tr. 36-40.  An ALJ found Minson not disabled on August 30, 1998, despite the medical evidence establishing that Minson had severe limitations due to dwarfism.   Tr. 39.  The record does not indicate that Minson appealed this determination.

Minson again applied for SSI on April 15, 1999. Tr. 73-76.  A psychological evaluation was done with findings of depressive disorder, learning disorder and a Global Assessment Functioning (GAF) of 60[2]; a physical assessment was done with a diagnosis of history of dwarfism with multiple pain syndrome.  Tr. 162.  A disability examiner found Minson not disabled on August 2, 1999. Tr. 262-63. The record does not indicate that this determination was appealed at any step in the appeals

---

[1]  Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer February 4, 2010 (Docket #13).

[2]  The GAF scale is used to report a clinician's judgment of the patient's overall psychological, social and occupational functioning on a scale of 1 to 100.  It does not include impairment in functioning due to physical or environmental limitations.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed., Text Revision, 2002)("*DSM*"), 34.  A GAF score of 61-70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning."  *Id.* (emphasis original).

process.

The Commissioner denied Minson's present application for SSI initially and upon reconsideration (Tr. 42-50), and an Administrative Law Judge ("ALJ") held a hearing on February 13, 2007.  Tr. 406-446.  Notably, Minson elected to proceed without representation because she did not think "an attorney could change [her condition] one way or another."  Tr. 410.  Minson explained this was because she has had her alleged disabilities since birth.  *Id.*  On May 23, 2007, the ALJ found Minson not disabled.  Tr. 18-28.  On June 6, 2009, Minson's request for review was denied by the Appeals Council making the ALJ's decision the final  decision of the Commissioner. Tr. 6-9. This request for judicial review followed.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps in determining disability under the meaning of the Act.  20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If she is, the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i).  At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the twelve-month duration requirement.  20 C.F.R. §§ 416.909; 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, she is not disabled.  *Id.*

At step three, the ALJ determines if the severe impairment meets or equals a "listed" impairment in the regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If she determines the impairment meets or equals a listed impairment, the claimant is disabled.  20 C.F.R. § 416.920(d).

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other

relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments. 20 C.F.R. § 416.920(e); Social Security Ruling ("SSR") 96-8p. The ALJ uses this information to determine if the claimant can perform her past relevant work at step four. 20 C.F.R. § 416.920(a)(4)(iv).

If proceedings reach step five, the Commissioner must determine if the claimant is capable of performing work existing in the national economy. 20 C.F.R. §§ 416.920(a)(4)(v); 416.920(f); *Yuckert*, 482 U.S. at 141-2; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches the fifth step, the burden of production shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.* at 1100. If the Commissioner meets this burden the claimant is not disabled. 20 C.F.R. § 416.966; 416.920(g).

## THE ALJ'S FINDINGS

The ALJ found that Minson had not been engaged in substantial gainful employment since September 1, 2004. Tr. 21. The ALJ found Minson's borderline IQ, learning disorder, dwarfism and depression "severe" at step two in the sequential proceedings. Tr. 21. However, the ALJ found that these impairments did not meet a listing at step three. *Id.* The ALJ found Minson "not entirely credible" (Tr. 22), and evaluated Minson's RFC:

> [T]he claimant has the residual functional capacity to perform at the light exertional level. She can lift or carry 10 pounds frequently and 20 pounds occasionally. She can be on her feet approximately two

4 - FINDINGS AND RECOMMENDATION

> hours in an eight hour workday.  She can participate in occasional crouching, crawling, balance, climbing, kneeling, and stooping.  She cannot perform complex tasks or detailed instructions.  She is to have no close interaction with the general public.

*Id.*  At step four, the ALJ found that Minson had no past relevant work, but found that Minson could perform work in the national economy at step five.  Tr. 27.  The ALJ therefore found Minson not disabled.  Tr. 28.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson* v. *Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The reviewing court may not substitute its judgment for that of the Commissioner. *Robbins v. Soc. Sec. Admin,* 466 F.3d  880, 882 (9th Cir. 2005); *Edlund v. Massinari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion.  *Burch v. Barnhart,* 400 F.3d 676, 679 (9th Cir. 2005).  The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews,* 53 F.3d at 1039.

In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record,

including, *inter alia,* medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883, *citing* SSR 96-8p at *5 (available at 1996 WL 374184); 20 C.F.R. § 404.1545(a)(3); *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir.1996). However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir. 2007).

## **DISCUSSION**

Minson challenges the ALJ's evaluation of (1) her testimony, (2) the opinions of a treating physician and an examining physician, (3) the opinions of two examining psychologists, and (4) the lay testimony.[3] Minson asserts that the ALJ should have found her unable to perform work in the national economy, and therefore disabled, at step five in the sequential proceedings.

## I.    **August 30, 1998 ALJ Decision[4]**

An ALJ found Minson not disabled on August 30, 1998. Tr. 36-40. The ALJ based this determination upon limitations alleged from Minson's dwarfism alone. *Id.* The August 30, 1998

---

[3] Claimant argues that the ALJ's Step Three analysis was insufficient. The ALJ found that claimant did not have an impairment or combination of impairments that equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ noted a discrepancy between two verbal IQ testing results. However, regardless of the discrepancy, the verbal IQ scores only establish the cognitive impairment under §12.05C as of the time of evaluation when Minson was over 22 years old. See *Costa v. Astrue,* 2010 WL 3893586 (D.Or. September 30, 2010).

[4] While neither party raises this issue it is prudent to address the 1998 litigation involving claimant. Claimant made no appeal of her 1999 application and there are no findings regarding that application that would have any preclusive effect.

decision does not evaluate Minson's presently alleged mental impairments, or her alleged mental impairments in combination with her dwarfism. *Id.*

Res judicata principles apply in the context of social security applications and appeals. *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). Absent "changed circumstances," a claimant cannot raise an issue that has previously been litigated. *Id.* A new impairment may constitute a "changed circumstance," *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995).[5]

The previous ALJ did not discuss Minson's alleged mental deficiencies, and res judicata principles thus do not apply to any analysis of these impairments. Here the ALJ made no reference to nor express statement that she found any of the previous ALJ's findings preclusive and controlling. See *Costra v. Astrue*, at *16. Because the ALJ must consider the effects of all of Minson's impairments, singularly and in combination, res judicata principles also do not apply to the ALJ's present RFC analysis.

## II.    Medical Source Statements

Minson challenges the ALJ's evaluation of the opinions of treating physician Dr. Ross, examining physician Dr. Maloney, and examining psychologists Drs. Matzke and Higgins-Lee.

### A.    Standards: Medical Source Statements

Disability opinions are reserved for the Commissioner. 20 C.F.R. § 416.927(e)(1). However, when making that determination, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester*, 81 F.3d at 830. The ALJ must also

---

[5] A change in a claimant's age category may also be a "changed circumstance". *Chavez v. Bowen*, 844 F.2d at 693. Here, claimant was 41 years old in 1998 and was 49 year and ten months at the time of the May 23, 2007 hearing, arguably "closely approaching advanced age". 20 C.F.R. § 416.962(d).

generally give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting a treating physician in favor of an examining physician. *Id.* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). In addition, the ALJ must ordinarily give greater weight to opinions rendered by specialists. 20 C.F.R. § 416.927(d)(5).

### B.    Analysis: Medical Source Statements

#### 1.    Treating Physician Dr. Ross

Minson asserts that the ALJ erred by failing to address the opinion of treating physician Dr. Ross regarding her musculoskeletal pain. Pl.'s Opening Br.,11-12. Dr. Ross treated Minson at frequent intervals between February 14, 2005, and March 21, 2006. Tr. 304, 308, 376, 378, 380, 382, 384, 389, 391, 393, 395, 397. During this time Dr. Ross diagnosed dwarfism, congenital chondromalacia, osteoarthritis, headaches, depression, asthma, and kidney stones. *Id.* Notably, on February 14, 2005, Dr. Ross stated that Minson's reported leg pain is "likely related" to her "inherited bone defects," which include dwarfism. Tr. 397. The ALJ cited Dr. Ross's treatment of Minson, but did not note his finding that her pain was attributable to her bone defects. Tr. 26.

The ALJ need not discuss evidence that is "neither significant nor probative." *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003). Dr. Ross's opinion establishes a link between Minson's dwarfism and associated musculoskeletal deformities and her reported pain. Tr. 397. It was therefore both significant and probative. Furthermore, Dr. Ross's opinion directly contradicts the ALJ's hearing statements that, in the ALJ's opinion, dwarfism does not cause pain. Tr. 425, 432. The ALJ's statement is erroneous. For all of these reasons, the ALJ's omission of Dr. Ross's

opinion regarding the link between Minson's dwarfism and her musculoskeletal pain is significant. The effects of this error are discussed below.

### 2. Examining Physician Dr. Maloney

Minson asserts that the ALJ did not address Dr. Maloney's opinion restricting her to lifting less than ten pounds frequently and ten to fifteen pounds occasionally. Pl.'s Opening Br. 13.

Dr. Maloney examined Minson for the Oregon Department of Health and Human Services ("DHS") on January 21, 2005. Tr. 217-221. Dr. Maloney assessed dwarfism with "slight reduction in contouring of limbs." Tr. 219. Dr. Maloney completed a separate physical capacity residual function report for DHS detailing Minson's abilities and limitations. Tr. 220-21. Here Dr. Maloney stated that Minson could frequently lift less than ten pounds, and occasionally lift or carry fifteen pounds. Tr. 220. Dr. Maloney stated that Minson could sit six hours in an eight-hour workday, was limited in pushing and pulling with both upper and lower extremities, could never climb, and could occasionally balance, stoop, kneel, crouch, or crawl. Tr. 220. Dr. Maloney indicated no manipulative limitations, and no environmental limitations other than exposure to occupational hazards such as heights or machinery. Tr. 221.

The ALJ cited Dr. Maloney's examination findings that Minson had functional flexibility, strength, and function of her limbs, was "able to perform a higher level of coordination with her hands," and had no impairment in cognition, communication, and social functioning. Tr. 26. While this language reflects Dr. Maloney's diagnostic conclusions (Tr. 221), the ALJ entirely omitted Dr. Maloney's associated work-related limitations. For instance, Dr. Maloney limited lifting to less than ten pounds frequently and only fifteen pounds occasionally. Dr. Maloney indicated that claimant could never climb. These restrictions are not reflected in Minson's RFC. Because work-related

limitations are crucial to a determination regarding a claimant's alleged disability, this omission was

significant.  The effect of this error is discussed below.

### 3.      Examining Psychologist Dr. Matzke

Minson asserts that the ALJ omitted examining psychologist Dr. Matzke's opinion that she

was limited in her ability to respond appropriately to work situations.  Pl.'s Opening Br., 12.

Examining psychologist Dr. Matzke evaluated Minson on June 2, 1999, in conjunction with

Minson's 1999 application for disability benefits.  Tr. 157-62.  Dr. Matzke assessed a full-scale IQ

of 86 (Tr. 159), and diagnosed a depressive disorder, and a learning disorder.  Tr. 162.  Dr. Matzke

stated that Minson was "capable" of responding to work situations or requirements, but that this was

limited by her learning disorder.  Tr. 162.

The ALJ cited Dr. Matzke's opinion, and noted Minson's reports of her activities of daily

living to Dr. Matzke and Dr. Matzke's IQ test results.  Tr. 24.  The ALJ also cited Dr. Matzke's

finding that Minson was "capable in all functional abilities" except understanding, remembering, or

carrying out complex job instructions.  Tr. 24.   Dr. Matzke gave Minson a GAF of 60. Tr. 162.

The ALJ's RFC precludes Minson from performing complex tasks or following detailed

instructions.  Tr. 22.  This finding incorporates Dr. Matzke's indicated limitations regarding

Minson's functional abilities.  Therefore, no error arises regarding the ALJ's analysis of Dr.

Matzke's opinion.

### 4.      Examining Psychologist Dr. Higgins-Lee

 Minson asserts that the ALJ did not properly evaluate the opinion of examining psychologist

Dr. Higgins-Lee.  Pl.'s Opening Br. 13-15.

Dr. Higgins-Lee evaluated Minson on November 20, 2004. Tr. 197-208. Dr. Higgins-Lee performed a clinical interview and evaluation, and administered numerous psychological tests. *Id.* She assessed mild mental retardation, learning disorder, cognitive disorder, and adjustment disorder. Tr. 202. Dr. Higgins-Lee based these assessments upon Minson's IQ test results showing a verbal IQ of 65, a performance IQ of 95, and a full scale IQ of 76. Tr. 199-201. Dr. Higgins-Lee stated that the Minson's verbal IQ of 65 is in the mildly mentally retarded range but that Minson's performance IQ of 95 was within normal limits. Tr. 199. She concurrently stated that Minson's memory and processing speed tests showed cognitive impairment (*id.*), and that other associated tests showed learning disorder. Tr. 199-201. Dr. Higgins-Lee found Minson's GAF to be 45. Tr. 202. The ALJ noted that "Dr. Higgins-Lee's overall assessment was that claimant had too many barriers to overcome to be successfully employed due to her age, lack of work history, VIQ score of 65, and low level of academic skills." Tr. 25.

The ALJ cited Dr. Higgins-Lee's findings but concluded that reviewing physicians at Disability Determination Services[6] "disagreed with Dr. Higgins-Lee's findings," and that "Dr. Higgins-Lee's testing is inconsistent with other IQ testing and does not reflect the claimant's actual performance." Tr. 25. Thus, the ALJ essentially rejected Dr. Higgins-Lee's findings.

A reviewing physician's opinion cannot constitute substantial evidence justifying rejection of a treating or examining physician's opinion. *Lester*, 81 F.3d at 831. Therefore, the ALJ's reliance upon any DDS findings to reject Dr. Higgins-Lee's opinion is misplaced. The ALJ may reject an

_____

[6]DDS is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 U.S.C. § 421(a) and 20 C.F.R. § 416.903.

11 - FINDINGS AND RECOMMENDATION

examining medical source's opinion because it is inconsistent with the opinion of a treating medical source, and in such circumstances must generally give greater weight to the treating source's opinion. *Id.* at 830. No other treating medical source of record conducted IQ testing. Thus, the ALJ's finding that Dr. Higgins-Lee's testing is inconsistent with other IQ testing is based upon an unspecified comparison with another examining psychologist. This analysis is not based upon substantial evidence. Therefore, the ALJ's findings and conclusions regarding Dr. Higgins-Lee's opinion should not be affirmed.

### C.      Conclusion: Medical Source Statements

The ALJ's analysis of the opinions of Drs. Ross, Maloney, and Higgins-Lee are not based upon the record or the correct legal standards. The effects of these errors are discussed below. Minson fails to establish reversible error in the ALJ's analysis of Dr. Matzke's opinion.

## III.   Minson's Credibility

Minson asserts that the ALJ failed to provide adequate reasons for finding her not credible.

### A.      Standards: Credibility

The ALJ performs a two-step analysis in her credibility finding. First, the ALJ determines if the claimant has shown an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged." *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007) (citing *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). If the claimant establishes such an impairment, and there is no finding of malingering, the ALJ proceeds to the second step, where she must provide "clear and convincing" reasons for finding a claimant not credible. *Id*.

The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court

to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F.3d at 1284. The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id.*  Once a claimant shows an underlying impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence."  *Robbins*, 466 F.3d at 883.

### B.    Analysis: Credibility

The ALJ's credibility analysis cited Minson's activities of daily living, her work history, and her residence at a women's shelter.  Tr. 22-23, 26.  While acknowledging that Minson's medically determinable impairments could be expected to produce alleged symptoms, the ALJ found that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Tr. 22.

### 1.    Activities of Daily Living

The ALJ's credibility analysis primarily rests upon  Minson's activities of daily living.  Tr. 22-23. Here the ALJ cited Minson's testimony that she spent time "thinking," that she lets her dogs out, and straightens her living quarters.  Tr. 22.  The ALJ stated that Minson "indicated" that she cooks for her ten year old daughter, cleans, and does laundry on Saturdays.  Tr. 23.  Finally, the ALJ

noted that Minson had just received a driver's license. *Id.* [7]

The ALJ's credibility analysis may cite a claimant's activities of daily living. *Smolen*, 80 F.3d at 1284. These activities may show skills transferable to a workplace, *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007), or show activities inconsistent with allegations of total disability. *Batson*, 359 F.3d at 1196.

The ALJ citations to Minson's testimony that she spends her days "thinking" and performing menial household tasks are based upon the record. Tr. 411, 413. These activities are not necessarily transferable to a workplace nor contradict Minson's allegation of disability. Further, a claimant need not be utterly incapacitated to receive benefits, and completion of minimal sheltered activities does not show that a claimant's allegation of disability is without merit. *Orn*, 495 F.3d at 639. The ALJ's decision to deny benefits to a claimant with limited mental capacity for "thinking" and performing very basic household chores contravenes the applicable legal standard. This finding should not be sustained.

### 2.    Work History and Credibility

The ALJ recited Minson's testimony that she worked for a year and a half as a housekeeper for three or four hours per day, that cleaning windows made her arms hurt, and that she would be bedridden following such activity for two or three days. Tr. 23. The ALJ's conclusion regarding this testimony is unclear.

An ALJ may consider a claimant's work history in assessing a claimant's credibility. *Smolen*, 80 F.3d at 1284. However, questioning the credibility of a disabled claimant for not

---

[7] Minson's testimony revealed that it took her seven years to get her driver's license and that she had to take the test orally as she could not read. Tr. 414.

working circumvents the purpose of disability proceedings.  Any inferences that Minson's limited

work history supports the ALJ's credibility finding should not be sustained.

### 3. Minson's Residence in a Women's Shelter

Finally, the ALJ noted that Minson was living in a women's shelter to escape an abusive

relationship and that this resulted in a "period of instability causing emotional distress." Tr. 22, 26.

The ALJ's inferred that this was a temporary, stress-inducing condition, and that such circumstance

supports an inference that Minson functioned at a higher level at other times, and "is mentally

capable of sustaining full time work..." Tr. 22, 24.   This analysis is flawed.  The ALJ points to no

evidence in the record establishing that Minson functioned at a higher level outside the women's

shelter.  The activities described by Minson while in the shelter were similar to the activities she

performed at the time of the hearing.  Tr. 97-104, 413-414.  Additionally, Minson received assistance

with various tasks requiring reading skills while in the shelter contravening the implication that she

could function at a higher level at other times.  Tr. 104.   This finding is not based upon the record

or the appropriate legal standards and should therefore be rejected.

### C. Conclusion: Credibility

In summary, the ALJ failed to provide adequately clear and convincing reasons for finding

Minson not credible.  This finding should not be sustained.  The effect of the ALJ's error is

discussed below.

## IV. Lay Witness Testimony

Minson asserts that the ALJ improperly assessed the lay witness testimony of her mother,

Laura Thompson, and her sister, Mary Alice Davis.  Pl.'s Opening Br. 16-18.

### A.    Standards: Lay Witness Testimony

The ALJ has a duty to consider lay witness testimony.  20 C.F.R. § 416.945(a)(3); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).  Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993).  The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F.3d at 512.

### B.    Testimony

#### 1.    Laura Thompson

Minson's mother, Laura Thompson, testified at Minson's February 13, 2007 hearing.  Tr. 417-28.  Thompson first testified that Minson ran away from home as a teenager, and that Minson presently lives with Minson's sister.  Tr. 418.  Thompson testified that Minson was developmentally delayed compared to other children (Tr. 418-19), and that Minson's dwarfism has caused Minson pain since her teenage years.  Tr. 419.  She  explained that Minson "could not learn" in school, and that she was in special education.  *Id*.  Thompson also stated that Minson never learned to read, and, for example, could not understand concepts such as Room 400 indicating a fourth-floor room.  *Id*.

Thompson went on to testify that Minson could not retain instructions from day to day, and that she "doesn't understand things," though she may indicate understanding.  Tr. 421.  Thompson testified that Minson's house was condemned because she could not care for it, and that her husband and her children took advantage of her and treated her "like scum."  *Id*.  Thompson also stated that

Minson had the "brains of a canary" (Tr. 422) and is "off the wall. La-la land," (Tr. 423) and that this has not changed over the years. Tr. 422.

Finally, Thompson testified that Minson had numerous childhood medical interventions for her lower-leg bone deformities, and that Minson experiences pain due to her bone deformities. Tr. 425. Thompson stated that Minson "won't follow through on things," and "gets taken advantage of." Tr. 426. Thompson also testified that Minson depends upon her ten-year old daughter for help filling out forms. *Id.*

### 2.    Mary Alice Davis

Minson's sister, Mary Alice Davis, also testified at Minson's February 13, 2007 hearing. Tr. 428-34. Davis stated that she sees Minson every few weeks, and talks to her more frequently than that. Tr. 428. Davis stated that Minson keeps another sister company, and that Minson perform minimal grocery shopping. Tr. 429-30. Davis went on to explain, "Pamela, I don't think has matured . . . . She's always had problems. She's not able to read. She has tried. She's been through special classes. . . . She cried, she tried so hard." Tr. 430. Davis also stated that Minson "still can't read." *Id.*

Davis further testified that Minson "uses her children as the adult, and yet she doesn't understand when they don't respond to her." *Id.* She stated that Minson's ten-year old daughter is failing in school because Minson does not make her attend school and Minson relies upon the child to get herself to school. Davis also stated that Minson is unable to help her child with homework and unable to read notes the school sends home. *Id.*

Finally, Davis stated that Minson experiences pain from bone deformities (Tr. 432-33) , and

that she did not believe Minson was capable of managing funds following any award of benefits. Tr. 434.

### C.    Analysis: Lay Witness Testimony

#### 1.    Lay Witness Testimony Analysis Based Upon Claimant Credibility

The Commissioner asserts that the ALJ's rejection of Thompson and Davis, as well as other lay witnesses presently unchallenged by Minson, should be affirmed because the ALJ found Minson herself not credible. Def.'s Br. 14, 16. Where the ALJ has first found a claimant not credible, the ALJ may subsequently reject lay testimony because it essentially reproduces the claimant's testimony. *Valentine v. Comm'r*, 574 F.3d 685, 694 (9th Cir. 2009). However, the ALJ herself must make this finding. Here, the ALJ made no such finding. This court cannot now rely upon reasoning the ALJ did not assert. *Bray*, 554 F.3d at 1225-26 (citing *SEC v. Chenery*, 332 U.S. 194, 196 (1947)); see also *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). Therefore this court cannot uphold the ALJ's analysis of the lay testimony simply because the ALJ found Minson not credible. This court declines to extend *Valentine* to a situation where the ALJ made no identifiable findings linking the lay testimony to the claimant's credibility. This argument should be rejected.

The Commissioner's reliance upon this argument is also misplaced because the ALJ did not properly find Minson not credible. Any findings predicated upon the ALJ's credibility analysis should not be sustained for this reason as well.

#### 2.    Germane Reason Required to Reject Lay Testimony

The ALJ reiterated the testimony of Thompson and Davis. Tr. 23. The ALJ made no identifiable credibility conclusion directly linked to either witness' testimony. Later in her decision,

the ALJ stated that the third party statements describe learning deficits and difficulty with managerial tasks, but that "neither described the claimant as having any physical disabilities." Tr. 23.  The ALJ subsequently concluded that she was "not persuaded that the claimant is mentally incapable of sustaining full time work within the limitations described above. "[8]  Tr. 23-24.

The ALJ must provide reasons germane to the witness for rejecting lay testimony.  *Nguyen*, 100 F.3d at 1467.  The ALJ's statement that she is "not persuaded" does not constitute such a reason. The ALJ may also reject lay testimony inconsistent with the medical evidence, *Lewis*, 236 F.3d at 512, but the ALJ presently made no attempt to correlate her three-page discussion of the medical evidence with reasons for discrediting the testimony of Thomas and Davis.  For this reason also, the ALJ's findings regarding the lay testimony should not be affirmed.

## V.    The ALJ's Step Five Findings

Minson finally asserts that the ALJ's findings that he can perform work in the national economy is not based upon substantial evidence.  Pl.'s Opening Br. 18-19 .

At step five, the ALJ may draw upon a vocational expert's testimony to show that claimant can perform work in the national economy.  *Tackett*, 180 F.3d at 1101.  The ALJ's questions to the vocational expert must include all properly supported limitations.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).  Here, the ALJ propounded hypothetical questions to the vocational expert based upon an RFC assessment which did not properly consider limitations described in Minson's testimony, the medical evidence, and the lay witness testimony.  Tr. 435-36.    The vocational expert's testimony is therefore without probative value.  The ALJ's step five finding

---

[8] It is not clear whether the ALJ is questioning claimant's credibility or the lay witnesses credibility by this statement.

should not be sustained.

## **REMAND**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000.), *cert. denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman,* 211 F.3d at 1178 (quoting *Smolen,* 80 F.3d at 1292). In such circumstances the reviewing court must credit the improperly rejected evidence. *Vasquez v. Astrue*, 547 F.3d 1101, 1106-07 (9th Cir. 2008) (*en banc review denied*, 572 F.3d 586 (9th Cir. 2009)). It is axiomatic, however, that the reviewing court may not credit testimony and subsequently award benefits contrary to the Act. *See Vasquez*, 572 F.3d at 589 (O'Scannlain J., dissenting).

The ALJ failed to provide legally sufficient reasons for rejecting Minson's testimony. Minson testified that she lived in a women's shelter between 2003 and the beginning of 2004 (Tr. 412), and is presently homeless and living in her sister's garage. Tr. 411. Minson stated that she does limited household chores as she is able, such as cleaning off dishes and loading a dishwasher in her sister's house (Tr. 411), letting her dog out in the yard, or putting clothes in a washing machine. Tr. 413. Minson also testified that she drives and may occasionally drive her nephew. *Id.*,

Tr. 414.  Regarding her ten-year old daughter, Minson stated that she cares for the child "as much as I can."  *Id.*  Finally, Minson testified that she cannot read, *id.*, and has always had difficulty remembering tasks she must learn.  Tr. 440.

The ALJ also improperly rejected the opinions of Drs. Ross, Maloney, and Higgins-Lee. Their opinions establish that Minson's has pain resulting from her bone deformities (Tr. 397), that she is limited to less than light work (Tr. 220), and that Minson has an IQ within normal limits, but a cognitive disorder and learning disorder.  Tr. 199-201.  Additionally, the testimony of Thompson and Davis shows limitations in Minson's ability to understand, remember, and perform tasks in her very basic activities of daily living as well as a history of physical deformity and pain.  Tr. 426, 430. This evidence all points towards a finding of disability.  In such circumstances, the improperly rejected evidence should be credited.  *Hammock v. Bowen*, 879 F.2d 498, 503-04 (9th  Cir. 1989) (crediting as true erroneously rejected claimant testimony and physician opinions where treating physicians's opinions supported claimant's testimony).  The court therefore credits this evidence and now discusses the effect of the credited testimony and medical opinions under the second and third prongs of the *Harman* analysis.

In determining whether to award benefits or remand the matter for further proceedings the court must determine whether "outstanding issues remain in the record" under the second *Harman* prong.  *Harman*, 211 F.3d at 1178.  Neither party asserts that the record is insufficient.  The court finds the record sufficiently developed.

Therefore the court must finally determine whether the record clearly requires an award of benefits after the improperly rejected evidence is credited.  *Harman*, 211 F.3d at 1178.  Because

Minson was unrepresented, no questions incorporating the improperly rejected evidence were proffered to the vocational expert. In addition, the Commissioner's regulations establish that a claimant who is (1) closely approaching advanced age,[9] (2) illiterate, and (3) limited to light or sedentary work is disabled. 20 C.F.R. § 20 C.F.R. §§ 404.201.09; 404.202.09. Minson is consequently disabled under the Commissioner's regulations.

## CONCLUSION AND RECOMMENDATION

The ALJ's decision is not based upon the appropriate legal standards or substantial evidence. Crediting the improperly omitted testimony establishes that Minson is disabled under Title XVI of the Act. The ALJ's decision should therefore be reversed and remanded for the immediate calculation and award of benefits.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due November 29, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

---

[9] Minson was 49 years 10 months at the time of the ALJ's decision and one month short of her 52nd birthday at the time the Commissioner denied her request for review.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 15th day of November, 2010.

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge

23 - FINDINGS AND RECOMMENDATION